PATTI GOLDMAN (DCB #398565)
AMANDA GOODIN (WSB #41312)
JAN HASSELMAN (WSB #29107)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
agoodin@earthjustice.org
jhasselman@earthjustice.org

*Attorneys for Plaintiffs Sierra Club and*
*Kentuckians for the Commonwealth*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB and KENTUCKIANS FOR THE COMMONWEALTH,<br><br>              Plaintiffs,<br><br>    vs.<br><br>U.S. RURAL UTILITIES SERVICE; THOMAS J. VILSACK, in his official capacity as Secretary of the U.S. Department of Agriculture; and JONATHAN S. ADELSTEIN, in his official capacity as Administrator of the U.S. Rural Utilities Service,<br><br>              Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

INTRODUCTION

1.       This is an action for declaratory and injunctive relief under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 551 et seq., the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4321 et seq., and the Rural Electrification Act ("RE Act"), 7 U.S.C.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 1 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

§ 901 et seq.  Plaintiffs Sierra Club and Kentuckians for the Commonwealth ("Plaintiffs")
challenge the failure of the U.S. Rural Utilities Service ("RUS") to comply with NEPA and the
RE Act prior to granting approvals, including a $900,000,000 lien accommodation, to enable the
East Kentucky Power Cooperative ("EKPC") to construct a new coal-fired electricity-generating
unit, the J.K. Smith Unit 1, in Clark County, Kentucky ("Smith unit").  Plaintiffs also bring as-
applied and facial challenges to regulations promulgated by RUS that purport to exempt such
approvals and lien accommodations from environmental review, contrary to the requirements of
NEPA.

      2.     The new Smith unit, if constructed, will be a major source of greenhouse gas
pollution and will contribute to global warming; the plant will also emit other dangerous
pollutants, including particulate matter, nitrogen oxides, ozone-forming constituents, mercury,
and other hazardous air pollutants.  The U.S. Environmental Protection Agency has determined
that all of these pollutants pose a significant risk to human health and the environment.

      3.     Because of prior federal financing of EKPC facilities, the United States owns a
first lien on all or nearly all of EKPC's existing and future facilities—such a lien ensures that the
United States can recover some of the existing debt owed to the government by EKPC in the
event that EKPC defaults on its loan payments.  On July 31, 2009, RUS granted EKPC a lien
accommodation of up to $900,000,000 in order to allow EKPC to obtain private financing for the
construction of the new Smith unit.  The $900,000,000 lien accommodation granted by RUS
allows a new private lender to take a full pro-rata share of mortgage security and controls on up
to $900,000,000 of EKPC's assets to secure a new private loan.  Despite the Smith unit's serious
impacts on human health and the environment, RUS failed to conduct an environmental analysis
of the plant's effects before granting the lien accommodation, in violation of NEPA.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 2 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

4.      Additionally, the terms of the governing loan contracts and mortgage agreements between RUS and EKPC require EKPC to obtain approval from RUS before taking actions to advance the Smith project, including before taking on additional debt, entering into certain contracts, or constructing or acquiring additional property.  On information and belief, RUS has already granted such approvals to enable EKPC to proceed with construction of the Smith unit, and EKPC will have to seek further such approvals in the future to proceed with construction of the Smith unit.  RUS has failed to conduct an environmental analysis of the Smith plant's effects on human health and the environment before granting such approvals, in violation of NEPA.

5.      Regulations promulgated by RUS purport to exclude approvals provided pursuant to loan contracts and security agreements, including lien accommodations, from all NEPA review.  7 C.F.R. § 1794.3.  This regulation is invalid facially and as applied to the approvals and lien accommodation RUS granted to EKPC to enable the construction of the new Smith unit because it is contrary to NEPA's requirement that federal agencies analyze the environmental impacts of all major federal actions with significant environmental effects.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18(a).

6.      Construction of the Smith unit promotes reliance on dirty, coal-fired power instead of renewable energy and energy efficiency.  RUS granted the $900,000,000 lien accommodation in spite of and without adequate consideration of its environmental consequences, in violation of the RE Act.

7.      Plaintiffs seek the following relief: a) a judgment declaring that RUS has violated NEPA and the APA by granting the EKPC lien accommodation and other approvals without consideration of environmental impacts and alternatives, as required by NEPA; b) a judgment declaring that RUS has violated the RE Act and APA by granting the EKPC lien accommodation

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 3 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

without consideration of environmental impacts, as required by the RE Act; and c) an order

setting aside the EKPC lien accommodation and other approvals.  Plaintiffs also seek an

injunction: a) prohibiting RUS from granting EKPC any other approvals regarding the new

Smith unit, including approval of any additional debt, construction contracts, or property

acquisitions, until RUS has prepared an environmental impact statement ("EIS") examining the

effects of and alternatives to the grant of the approvals, including the construction of the Smith

unit; b) setting aside as invalid the RUS regulation which purports to exempt from NEPA

compliance any lien accommodation or approval pursuant to a loan contract or security

instrument; and c) prohibiting RUS from granting EKPC any further lien accommodations

regarding the new Smith unit until RUS has complied with the RE Act.

## JURISDICTION AND VENUE

8.      This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C.

§§ 701-706.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 2201

(declaratory judgment), and § 2202 (further relief).

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e) as defendant RUS resides

in this district, plaintiff Sierra Club maintains an office in this district, and the actions that are the

subject of this litigation were taken in this district.

## PARTIES

10.     The plaintiffs in this action are:

A.      SIERRA CLUB, the nation's oldest grass-roots environmental organization

founded in 1892.  The Sierra Club is incorporated in California, and has its headquarters in San

Francisco, California.  It has 600,000 members nationwide, including approximately 4,700

members in Kentucky.  The Sierra Club is dedicated to the protection and preservation of the

natural and human environment.  One of the Sierra Club's main priorities, both nationwide and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 4 -

in Kentucky, is to address the urgent problems of global warming, air pollution, and our dependence on dirty, nonrenewable energy sources such as coal.  The Sierra Club and its members have long-standing interest and expertise in these issues.

B.      KENTUCKIANS FOR THE COMMONWEALTH ("KFTC") is a membership-led organization that believes in the power of people, working together, to challenge injustices and improve the quality of life for all Kentuckians.  Begun in 1981 with about 25 people, KFTC has grown to nearly 6,000 members in 2008.  Many of KFTC's members are EKPC customers. Its membership is mostly middle- and low-income folks from the mountains and other rural communities, small towns, and urban centers of our state.  KFTC helps individuals organize to win change on a broad range of issues, including restoring voting rights, promoting sustainable economic development policies, reducing environmental destruction, and advancing sustainable energy policies and practices. The organization has nearly 2,000 dues-paying members who live in counties served by East Kentucky Power Cooperative's member co-ops.

11.      Plaintiffs and their members have been actively involved in the permitting process for the Smith unit, and in promoting clean, efficient, economically beneficial alternatives to the project.  The Sierra Club's Kentucky Chapter, in partnership with Kentuckians for the Commonwealth and Kentucky Environmental Foundation, commissioned a report detailing a portfolio of renewable energy and energy efficiency options as an alternative to the proposed Smith unit.  Plaintiffs and their members filed extensive comments on proposed air and dredge and fill permits required for the project, and hundreds of their members have either testified at state-sponsored hearings or submitted comments on these draft permits.

12.      Plaintiffs' members live, work, recreate, farm, and engage in other economic activities that will be adversely impacted by the proposed Smith unit.  They include senior

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 5 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

citizens, children, people with asthma, and other individuals who are especially vulnerable to harm from exposure to fine particulate matter, ground-level ozone, and other harmful air pollutants that will be emitted by the project's new coal-fired electric generating unit.

13.     Plaintiffs' members, including property and land owners living near the plant and elsewhere, will be adversely affected by drought and extreme weather events that are expected to increase due to global warming, to which the project's massive carbon dioxide and nitrous oxide emissions will make a significant contribution.

14.     The aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests of plaintiffs and their respective members have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by defendants' failure to comply with federal law as described below.

15.     The defendants in this action are:

A.     Defendant U.S. RURAL UTILITIES SERVICE is the agency within the Department of Agriculture responsible for granting the EKPC lien accommodation and other approvals, and for promulgating the challenged regulations.

B.     Defendant THOMAS J. VILSACK is the U.S. Secretary of Agriculture and in that capacity has final responsibility for actions taken by RUS.  Mr. Vilsack is sued in his official capacity.

C.     Defendant JONATHAN S. ADELSTEIN is the Administrator of RUS and in that capacity has management responsibility for actions of RUS, including the agency's compliance with NEPA and the RE Act.  Mr. Adelstein is sued in his official capacity.

## STATUTORY AND REGULATORY REQUIREMENTS

I.     NEPA

16.     Congress enacted NEPA to "promote efforts which will prevent or eliminate

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 6 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

damage to the environment."  42 U.S.C. § 4321.  To fulfill this goal, NEPA requires federal

agencies to analyze the environmental impacts of a particular action before proceeding with that

action.  Id. § 4332(2)(C).  In addition, federal agencies must notify the public of their proposed

projects and allow the public to comment on the fully-disclosed environmental impacts of those

projects.  40 C.F.R. § 1501.2.

17.     The cornerstone of NEPA is the environmental impact statement ("EIS").  An EIS

is required for all "major Federal actions significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  Federal actions include "new and

continuing activities, including projects . . . entirely or partly financed, assisted, conducted,

regulated or approved by federal agencies."  40 C.F.R. § 1508.18(a).  An EIS must examine both

the direct and reasonably foreseeable indirect effects of the federal action.  40 C.F.R. § 1508.8.

18.     The Council on Environmental Quality ("CEQ") has adopted regulations

implementing NEPA.  The CEQ regulations require each federal agency "as necessary" to adopt

procedures to "supplement" the CEQ Regulations.  40 C.F.R. § 1507.3(a).  Such procedures must

"confine themselves to implementing procedures."  Id.

19.     RUS policies and procedures for implementing NEPA and the CEQ regulations

provide that an EIS will normally be required for proposed actions involving new electric

generating facilities of more than 50 megawatts.  7 C.F.R. § 1794.25.  The proposed Smith unit

is more than 50 megawatts.

20.     RUS policies and procedures for implementing NEPA and the CEQ regulations

provide that "[u]nder certain circumstances, such as when the project does not qualify for a

categorical exclusion," environmental review requirements "may apply to applications for lien

accommodations, subordinations, and releases."  7 C.F.R. § 1717.850(d).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 7 -

21.     RUS policies and procedures for implementing NEPA and the CEQ regulations

purport to exclude "[a]pprovals provided by RUS pursuant to loan contracts and security

instruments, including approvals of lien accommodations" from the definition of "actions" for

purposes of those policies and procedures, and state that such policies and procedures do not

apply to such approvals.  7 C.F.R. § 1794.3.

II.     THE RURAL ELECTRIFICATION ACT

22.     The Rural Electrification Act is a broad grant of authority to RUS to make loans

and loan guarantees for the provision of electricity and renewable energy programs in rural areas.

7 U.S.C. § 902(a); id. § 936.  The purposes of the RE Act include furnishing and improving

electrical service in rural areas, id. § 902(a); promoting energy conservation, renewable energy,

and energy efficiency, id. §§ 902(a), 904(a); and ensuring that consumers are provided with

affordable electricity, id. §§ 918a; 918b; 935(c).

23.     The RE Act provides that RUS may only issue loans if RUS finds that the security

for the loan is "reasonably adequate" and the loan will be repaid within the time agreed.

7 U.S.C. § 904(d).  Similarly, regulations implementing the Act provide that "[a]dequate loan

security must be provided for loans made or guaranteed by RUS."  7 C.F.R. § 1718.51.

Accordingly, it is RUS's policy to require a first lien on most or all of a borrower's assets to

secure RUS loans or loan guarantees.  Id.

24.     The RE Act provides that RUS may provide "financial assistance" to borrowers

by accommodating or subordinating the government's lien on a borrower's assets if doing so

would further the purposes of the Act.  7 U.S.C. § 936.

25.     The regulations implementing the RE Act provide that, prior to granting a lien

accommodation, RUS "will" consider the effects of the lien accommodation on "the achievement

of the purposes of the RE Act" and "the repayment and security of RUS loans secured by the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 8 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

mortgage."  7 C.F.R. § 1717.850(c).

FACTUAL BACKGROUND

I.    RUS'S LOANS TO EKPC

26.    Since the 1950s, the United States Department of Agriculture, through RUS and

its predecessor, the Rural Electrification Administration ("REA"), has issued EKPC numerous

direct loans and loan guarantees to allow EKPC to build, install pollution control devices, and

operate multiple power plants.

27.    As of December 31, 2008, the sum of EKPC's outstanding, long-term debt that is

owed directly to or guaranteed by RUS is over $1,600,000,000.  This total includes dozens of

outstanding notes for loans and loan guarantees awarded over the course of four decades; the

oldest outstanding notes date back to the 1970s and new notes were awarded at least as recently

as 2008.

28.    In connection with such loans and loan guarantees, EKPC and the United States,

first through the REA and later through RUS, executed loan documents, including at least twelve

loan contracts or contract amendments and at least sixteen mortgage and security agreements or

supplemental mortgage and security agreements.  These contracts and mortgages govern the debt

EKPC still owes to the United States; their terms provide the United States a security interest in

EKPC's assets and require EKPC to obtain RUS's approval before taking specific actions.

29.    Currently, the United States' security interest in EKPC's assets is governed by the

Restated and Consolidated Mortgage and Security Agreement made by and among East

Kentucky Power Cooperative and the United States of America and the National Rural Utilities

Cooperative Finance Corporation, dated January 2, 2004 ("2004 mortgage"), as updated and

amended by the Supplemental Mortgage and Security Agreement dated April 2, 2007 and the

Second Supplemental Mortgage and Security Agreement dated November 3, 2008.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 9 -

30.     In order to secure the repayment of the principal of and interest on EKPC's outstanding notes to the United States, the 2004 mortgage grants the United States a lien on all of EKPC's existing and hereafter constructed electric generating and transmission facilities; all of EKPC's existing and hereafter acquired easements; all of EKPC's existing and hereafter acquired licenses and permits; all of EKPC's existing and hereafter acquired contractual rights; all of EKPC's existing personal property and fixtures; and all rents, income, and profits derived from any of the above.

31.     Under the terms of the 2004 mortgage, so long as any of the notes remain outstanding, EKPC may not mortgage or encumber any of its property, purchase or acquire additions to its system, or enter into contracts for additions to its system without the consent of the United States.  Additionally, the 2004 mortgage provides that EKPC must maintain certain minimum average credit ratings at least two out of every three calendar years.

32.     Currently, EKPC's outstanding loans to the United States are governed by the Consolidated and Restated Loan Agreement made by and between East Kentucky Power Cooperative as Borrower and the United States of America as Lender, dated April 2, 2007 ("2007 contract"), as updated and amended by the Loan Contract Amendment dated November 3, 2008.

33.     Under the terms of the 2007 contract, EKPC may not extend or add to its property by construction or acquisition, or incur additional debt, without the prior approval of RUS.

II.     EKPC'S WEAK FINANCIAL POSITION

34.     EKPC is a member-owned generation and transmission electric cooperative with sixteen member distribution cooperatives.  EKPC provides electricity to its member distribution cooperatives which, in turn, provide electricity to customers in counties throughout Central and Eastern Kentucky.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

35.     EKPC's financial position is very weak.  Its equity rating is far below the average rating among cooperatives in the nation, and testimony from EKPC's consultants reveals that the cooperative would not qualify for an investment grade credit rating.

36.     At the end of 2006, EKPC's weak credit position led it to be in technical default of the covenants in its mortgage with RUS which require EKPC to maintain certain minimum credit ratings.  Specifically, EKPC's TIER and DSC ratio were lower than the minimum averages required by the 2004 mortgage.  The TIER (Times Interest Earned Ratio) is a credit measure that represents the relative ability of the cooperative to pay its long-term interest payments; the DSC (Debt Service Coverage) ratio is another standard credit measure.  Despite EKPC's failure to comply with the covenants of the 2004 mortgage, RUS did not declare EKPC to be in default under the governing mortgage agreement, nor did RUS enforce default actions. It was only RUS's willingness to forbear from making any declaration of default under the mortgage agreement that prevented EKPC from becoming insolvent.

37.     While EKPC is no longer in default of the covenants of the mortgage, its financial position continues to be weak.  According to EKPC's 2009 Annual Report, three significant measures of the Cooperative's financial health declined between 2007 and 2009: the TIER rating; the DSC ratio; and the 'net margin,' an accounting tool used to show generally the amount of cash available after all expenses and needs are met.

38.     Due to EKPC's weak financial position, in the absence of the RUS lien accommodation, it would be impossible for EKPC to obtain private financing for the new Smith unit.

III.    THE PROPOSED NEW SMITH UNIT

39.     EKPC is proposing to construct a new 278-MW electric generating unit at the J.K. Smith Station in Clark County, Kentucky.  The Smith Station is the location of nine existing

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 11 -

electric generating units, all of which are fueled by natural gas and fuel oil.

40.     The new Smith unit will be fueled by coal, and will emit substantial amounts of numerous pollutants that the U.S. Environmental Protection Agency has found to pose a significant risk to human health and the environment, including greenhouse gases, particulate matter, nitrogen oxides, ozone-forming constituents, mercury, and other hazardous air pollutants.

41.     EKPC initially planned to obtain financing from RUS for the new Smith unit. In 2008, however, RUS publicly announced its intention to cease issuing new loans and loan guarantees to support the construction of new coal-fired generating units. EKPC now plans to seek private financing for the new Smith unit.

42.     The U.S. Army Corps of Engineers has prepared a draft environmental impact statement for the proposed Smith unit. When RUS initially planned to provide direct loans to EKPC to support the construction of the Smith unit, RUS participated in the early phases of the NEPA process; however, when RUS decided not to offer EKPC direct loans, RUS took the position that no NEPA analysis was required for its actions and did not participate in the Corps' subsequent preparation of the draft environmental impact statement.

IV.     RUS'S APPROVAL OF THE LIEN ACCOMMODATION AND OTHER
        APPROVALS TO ENABLE CONSTRUCTION OF THE SMITH UNIT

43.     In 2008, the National Rural Utilities Cooperative Finance Corporation ("CFC") applied to RUS, on behalf of EKPC, for a lien accommodation in the amount of $900 million so that EKPC could obtain private financing for the new Smith unit.

44.     By letter dated July 31, 2009, RUS advised EKPC that it had approved a lien accommodation of its mortgage for EKPC in the amount of $900 million to permit EKPC to finance the construction of the new Smith unit.

45.     In internal memoranda recommending that RUS approve the lien accommodation,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

RUS states that the $900 million loan for which it provided a lien accommodation is intended to be an interim loan and that RUS may ultimately provide long-term financing for the construction of the new Smith unit.

46.     Even though the RUS's grant of the lien accommodation was a factual and legal prerequisite to constructing the Smith unit, and even though the Smith unit would have significant adverse impacts on human health and the environment, RUS did not prepare an environmental impact statement or complete any NEPA analysis prior to granting the EKPC lien accommodation, nor did RUS participate as a cooperating agency in the U.S. Army Corps of Engineers' NEPA process for the Smith unit.

47.     Additionally, RUS did not consider the purposes of the RE Act, including promoting reliance on clean, renewable forms of energy and energy efficiency, prior to granting the EKPC lien accommodation.

48.     In addition to requiring approval of any lien accommodation, the governing loan contracts and mortgages between EKPC and RUS require EKPC to obtain RUS's approval before taking most substantial steps to construct the Smith unit, including before assuming the additional debt anticipated by the lien accommodation and before entering into certain contracts for construction of the new unit.  RUS has already granted some such approvals and must grant others in order for EKPC to proceed with construction of the Smith unit.

49.     For example, in June 2005 or shortly thereafter, EKPC entered into a contract with the General Electric Company for the provision of one turbine generator for the new Smith unit.  This contract required and was subject to the approval of RUS.

50.     Upon information and belief, RUS granted approval of the EKPC contract with General Electric for the provision of the turbine generator.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 13 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

51.     Even though the RUS's grant of approval for the turbine contract was a factual

and legal prerequisite to constructing the Smith unit, and even though the Smith unit would have

significant adverse impacts on human health and the environment, RUS did not prepare an

environmental impact statement or any other NEPA analysis prior to granting the approval.

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

RUS Failed to Comply With NEPA Prior to Granting the EKPC Lien
Accommodation and Other Approvals

52.     RUS's grant of the EKPC lien accommodation and other approvals are final

agency actions subject to judicial review under the APA.  5 U.S.C. §§ 702, 704.

53.     NEPA requires federal agencies to prepare an environmental impact statement for

all "major Federal actions significantly affecting the quality of the human environment."  42

U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  "Major federal action" includes actions which are

potentially subject to Federal control and responsibility, including "new and continuing

activities, including projects . . . entirely or partly financed, assisted, conducted, regulated or

approved by federal agencies."  40 C.F.R. § 1508.18.  An EIS must examine both the direct and

reasonably foreseeable indirect effects of the federal action.  40 C.F.R. § 1508.8.

54.     The RE Act provides that RUS "may," in its discretion, grant "financial

assistance" to borrowers by approving lien accommodations, so long as such financial assistance

would further the purposes of the RE Act.  7 U.S.C. § 936.

55.     RUS's grant of a $900,000,000 lien accommodation and other approvals,

including approval of the turbine generator contract, to EKPC to enable EKPC to construct the

new Smith unit are major federal actions significantly affecting the quality of the human

environment within the meaning of NEPA and its implementing regulations.  42 U.S.C.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 14 -

§ 4332(2)(C); 40 C.F.R. §§ 1508.18, 1508.8.

56.     7 C.F.R. § 1794.3 cannot lawfully be applied to exempt RUS's grant of the EKPC

lien accommodation and other approvals from the environmental review requirements of NEPA

or the CEQ regulations.  Such application of the regulation would be contrary to the requirement

of § 102(2)(C) of NEPA that all federal agencies prepare an environmental impact statement for

major federal action significantly affecting the quality of the human environment, and the CEQ

regulations implementing NEPA, including 40 C.F.R. §§ 1501.4 and 1508.18.

57.     RUS has not completed an environmental impact statement or other adequate

environmental analysis in accordance with NEPA before granting the EKPC lien accommodation

and other approvals, in violation of Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and its

implementing regulations.  RUS's undertaking of such action without complying with NEPA is

arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the

meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

### RUS's NEPA Applicability Regulation Runs Counter to NEPA, Is Arbitrary and Capricious, and Exceeds RUS's Authority

58.     NEPA requires federal agencies prepare an environmental impact statement for all

"major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C); 40 C.F.R. § 1501.4.

59.     The CEQ regulations implementing NEPA require each federal agency "as

necessary" to adopt procedures to "supplement" the CEQ regulations.  40 C.F.R. § 1507.3(a).

Such procedures must "confine themselves to implementing procedures," and must comply with

NEPA and with the CEQ regulations.  Id.

60.     Approvals provided by RUS pursuant to loan contracts and security instruments,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 15 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

including approvals of lien accommodations, are federal actions that may be major and that may

have direct or indirect effects that significantly affect the quality of the environment within the

meaning of NEPA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.8, 1508.18.  Such actions require

preparation of an environmental impact statement or environmental assessment where the

underlying action may have significant environmental effects, such as the substantial

environmental effects resulting from the construction of a new coal-fired power plant.  7 C.F.R.

§ 1717.850(d); id. § 1794.25.

61.     Regarding the Smith unit specifically, RUS's grant of a $900,000,000 lien

accommodation and other approvals, including approval of the turbine generator contract, to

EKPC to enable EKPC to construct the new Smith unit are major federal actions significantly

affecting the quality of the human environment within the meaning of NEPA and its

implementing regulations.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.18, 1508.8.

62.     7 C.F.R. § 1794.3 purports to exempt all approvals pursuant to loan contracts and

security instruments, including lien accommodations, from NEPA review, regardless of their

environmental effects, on the grounds that approvals and lien accommodations are not "actions."

63.     By promulgating 7 C.F.R. § 1794.3, RUS has exceeded its authority under the

plain language of NEPA, 42 U.S.C. § 4332(2)(C), has acted ultra vires, and has acted arbitrarily,

capriciously, and not in accordance with NEPA, in violation of the Administrative Procedure

Act, 5 U.S.C. § 706(2).  In addition, by relying on 7 C.F.R. § 1794.3 in failing to comply with

NEPA prior to granting the EKPC lien accommodation and other approvals, RUS has acted ultra

vires, and has acted arbitrarily, capriciously, and not in accordance with NEPA, in violation of

the Administrative Procedure Act, 5 U.S.C. § 706(2).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 16 -

THIRD CLAIM FOR RELIEF

<u>RUS Failed to Comply With the RE Act and Implementing Regulations
in Granting the EKPC Lien Accommodation</u>

64.     The RE Act provides that RUS may provide "financial assistance" to borrowers

by accommodating the government's lien on a borrower's assets if doing so would further the

purposes of the Act.  7 U.S.C. § 936.

65.     Regulations implementing the RE Act require that prior to granting a lien

accommodation, RUS must consider the effects of the lien accommodation on "the achievement

of the purposes of the RE Act" and "the repayment and security of RUS loans secured by the

mortgage." 7 C.F.R. § 1717.850(c).

66.     The purposes of the RE Act explicitly include promoting renewable energy and

energy efficiency.  7 U.S.C. § 902(a); <u>id.</u> § 904(a).

67.     Enabling construction of the new Smith unit promotes reliance on dirty, coal-fired

power instead of renewable energy and energy efficiency.

68.     RUS failed to consider the effects of granting a $900,000,000 lien

accommodation to EKPC on the achievement of the purposes of the RE Act before granting the

EKPC lien accommodation, in violation of the RE Act and its implementing regulations.

7 U.S.C. § 936; 7 C.F.R. § 1717.850(c).

69.     RUS's grant of the EKPC lien accommodation without complying with the RE

Act and implementing regulations is arbitrary and capricious, an abuse of discretion, and not in

accordance with law, within the meaning of the Administrative Procedure Act.  5 U.S.C.

§ 706(2).

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 17 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

A.      Adjudge and declare that RUS violated the APA and/or NEPA when it granted the EKPC lien accommodation and other approvals;

B.      Adjudge and declare that RUS violated the APA and/or the RE Act in granting the EKPC lien accommodation;

C.      Adjudge and declare that 7 C.F.R. § 1794.3 is invalid facially and as applied to the EKPC lien accommodation and other approvals;

D.      Order the EKPC lien accommodation and other approvals set aside;

E.      Order RUS to prepare an environmental impact statement assessing the effects of granting the EKPC lien accommodation and other approvals, including the construction of the new Smith unit, that fully complies with the National Environmental Policy Act;

F.      Enjoin RUS from granting EKPC any further approvals, including any further lien accommodations, for the coal-fired unit at Smith until EKPC has fully complied with the APA, NEPA, and the RE Act;

G.      Award plaintiffs their reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation, under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

H.      Grant plaintiffs such further and additional relief as the Court may deem just and proper.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 18 -

Respectfully submitted this 14th day of June, 2010.


/s/  Patti Goldman
PATTI GOLDMAN (DCB #398565)
AMANDA GOODIN (WSB #41312)
JAN HASSELMAN (WSB #29107)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
agoodin@earthjustice.org
jhasselman@earthjustice.org

*Attorneys for Plaintiffs Sierra Club and*
*Kentuckians for the Commonwealth*


COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF   - 19 -